NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARCELLA COOPER on behalf of B.P., a minor     : | Civil Action No.  07-cv-4822 (PGS) |
|       Plaintiff,     : | |
|       v.     : | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY,     : | |
|       Defendant.     : | |

SHERIDAN, U.S.D.J.

Before the Court is an appeal by Marcella Cooper ("Cooper") on behalf of her daughter ("B.P."), a minor, from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Cooper's request for Child Supplemental Security Insurance ("SSI"). Plaintiff alleges disability due to asthma and a psychiatric condition. The application was initially denied on January 15, 2005 and upon reconsideration on October 19, 2005. (R. 23-25, 29-32, 253-254). A timely request for a hearing was filed, and a hearing was conducted on March 30, 2007 before ALJ Brian H. Ferrie. On May 21, 2007 the ALJ issued a decision denying SSI benefits. (R. 10-19). Plaintiff appealed to the Appeals Council which denied the application. (R. 5-7).  The action before the Court was timely commenced.

**Overview**

B.P. is a 12 year old girl who suffers from asthma and a psychiatric condition. She resides with her mother and her younger brother, and at various times with her grandmother and aunt. She has very little if any contact with her father. At the time of the hearing, B.P. was in the fifth grade. She experiences academic and behavioral difficulties in school but is not classified for special education. Overall, B.P. has a very poor attendance record at school. From kindergarten through the fourth grade, B.P. missed as much as two to three months of each school year due to illness and/or refusal to attend[1]. In fifth grade, her attendance significantly improved. The Elizabeth School District has provided tutoring at home when B.P. suffered psychiatric episodes.

B.P. has bipolar disorder which causes hallucinations with internal voices prompting her to kill herself and others. She has been hospitalized at least twice in the psychiatric unit of Trinitas Hospital and has been receiving psychotherapy and taking psychotropic medications (Risperdal) over the last several years. In addition, B.P. has asthma and uses an Albuterol inhaler to control that condition. B.P. suffers from insomnia and is up and about during the night. At her mother's direction, B.P. takes benedryl to induce sleep. B.P. is 5'5" tall and weighs approximately 200 pounds. B.P. has gained approximately 100 pounds since the time of her initial SSI application in 2004. A brief review of her medical treatment and school records is presented below.

---

[1]      Some teachers in their responses to questionnaires noted absenses as refusal to attend, but it is unclear whether they understood the nature and extent of B.P.'s psychiatric condition. The mother explained that in one incident, B.P. stayed out of school for two months because she saw a security guard and panicked, and every time she would take B.P. to school thereafter, she would "flip out" about the guard. (R. 351).

I.

B.P.'s psychiatric disorder has substantially worsened over the years but at present has stabilized. Her first major incident occurred on June 4, 2003. On that date, B.P. was admitted to Trinitas Hospital because of an anxiety attack subsequent to an argument between B.P. and a classmate. At that time B.P. locked herself in a bathroom stall at school saying that people were in there with her and they were telling her to do things like kill people. (R. 337). Her physical symptoms were shortness of breath, chest pain and hyperventilation. (R. 97-113).

In early July 2003, at the end of first grade, the Child Study Team at B.P.'s school found that B.P. missed 55 days of school and was tardy 38 days during the prior school year[2]. The Child Study Team found these absenses "impact seriously on her acquisition of basic skills" and recommended counseling, better attendance and studying at home when B.P. was absent due to asthma. (R. 139).

Two months later (September 9, 2003), B.P. underwent a psychiatric evaluation at Trinitas Hospital because of continuing emotional issues since the previous anxiety attack. (R. 115). She was described as fidgety, with euthymic mood, but without suicidal tendencies. Overall, B.P. was found to have a history of panic disorder, sleep disorder, hyperventilation and overreaction to stress. Most of her attacks were found to be situational. She was not a danger to herself or others. Art therapy was recommenced as a method to relieve these symptoms rather than more intensive psychotherapy. (R. 117).

On November 13, 2003, Nelson Turcios, M.D., Director of Pediatric Pulmonology at Trinitas Hospital, evaluated B.P. and opined that her asthma "symptoms appear to be triggered by upper respiratory infections, exertion and cigarette smoke exposure," and further noted that

---

[2]      B.P. missed 50 days in kindergarten.

"[f]amily/environmental history is contributory as her mother has asthma and both parents smoke". Her asthma was classified as moderate persistent. (R. 121). At that time, pulmonary testing revealed a normal study. (R. 125).

During second grade (academic year 2003-04), B.P. was absent 65 days and tardy on 26 occasions. (R. 146). Her grades improved slightly. In August 2004, B.P.'s teacher/tutor during the prior school year reported B.P. missed school two to three days per week and that her reading, math and written language skills were below level. The teacher noted that B.P. had serious problems in reading and comprehension, doing math problems and expressing ideas in written form. In addition, the teacher emphasized that B.P. had daily problems attending and completing tasks. Most notably, B.P. could not focus enough to finish tasks, or re-focus when interrupted, nor could B.P. complete homework accurately and/or work without distracting others. (R. 147).

At some point after commencement of the 2004-05 academic year, B.P's third grade teacher completed a questionnaire. The teacher indicated that B.P. was at the current instructional level of grade three in reading, math and written language; but that conclusion is at odds with the teacher's comments to the questionnaire asking for information about the following functional domains:

1.      Acquiring and using information. The teacher noted problems, stating that "B.P. is performing below grade level. She has difficulty completing tasks without assistance. Instructions need to be repeated; she is performing at first to second grade level.

2.      Attending and completing tasks. The teacher noted "obvious" problems with focus, refocusing, multi-step instructions, waiting to take turns, working without distracting others and working at a reasonable pace; and "very serious" problems with completing work accurately.

4

3.      Interacting and relating to others. "Slight problem" with cooperating, making friends, asking permission, and comprehension. (R. 155-72).

On December 29, 2004, Ernesto Perdomo, PhD, a psychiatrist, examined B.P. on behalf of the Social Security Administration. (R. 161-62). Dr. Perdermo wrote a thorough history. At the time, B.P. was in the third grade. She lamented that "children don't like to play with her," and she is a loner. She was mildly obese (4'8", height 120 pounds). However, she was very verbal and sociable. Her thought processes were organized, and she could follow instructions within range for her age. At the time, she reported auditory and visual hallucinations, hearing voices of her deceased grandmother, deceased aunt and a man with tattoos on his arms. These voices instructed her to kill herself and said that they would kill her family. Evidently, Dr. Perdermo requested that B.P. draw some pictures by Dr. Perdermo. Her drawings were of a man saying "you are next to die," and another drawing depicted a girl in flames. Dr. Perdermo classified these pictures as psychotic. She reported feelings of restlessness, tiredness and generalized fears. B.P.'s short term memory was fair. Dr. Perdemo opined that B.P. required long-term psychiatric treatment. In his opinion, she appeared to have schizoaffective disorder and her condition would last more than one year. Her psychosocial stressors were found to be severe due to hallucinations and school problems. (R. 161-162).

The next day, on December 30, 2004, B.P. was hospitalized due to her auditory and visual hallucinations. (R. 197). At the time, B.P. reported intense auditory and visual command hallucinations of her deceased relatives and an overweight 30-40 year old man who orders her to stab her family. B.P. was diagnosed with a psychotic disorder without specific suicidal or homicidal ideation. B.P. reported that she had these hallucinations for some time in the past, and they continually told her to hurt people. (R. 200). The doctor prescribed Risperdal and psychotherapy.

5

B.P. was advised not to return to school until therapy and medications alleviated the hallucinations. B.P. missed three months of school but was home tutored following this event. (R. 206).

According to outpatient clinic notes, B.P. had another episode in April 2005, and hospitalization was recommended, but her mother disagreed. At that time, B.P. ceased taking her medications.

In June 2005, B.P. was admitted to the psychiatric division of Trinitas Hospital for three weeks. Robert Bennett, M.D. noted that B.P. was referred from the outpatient clinic due to ongoing psychotic behavior . (R. 206-251). Prior to her admittance, she had been in outpatient treatment, was behaving well at home and was being home tutored. Her mother described B.P. as hyperactive – she talks constantly and is silly and giggly with "fast thoughts" and is often awake all night watching television.

Immediately prior to this hospitalization, she had been hearing voices again. Often she would awaken at night and be very scared. She would sleep with her grandmother because she imagined the bathroom was haunted and that people were coming out of the walls to kill her. The voices told her to "put a knife under your pillow and when mom comes to tuck you in, put a knife through her chest." (R. 207). The voices also told her to use a rope to hang herself, but B.P. insists that she really does not wish to kill herself or others. She also reported extra sensory abilities, such as predicting the future, reading minds and levitating objects.

During this hospitalization she resumed Risperdal and participated in individual, group and family therapy. With therapy she improved, and after three weeks, B.P. was discharged with orders to continue Risperdal tablets daily, to seek treatment for asthma and to have her hearing checked.

B.P. was seen by William Lathan, M.D., of Industrial Medicine Associates, P.A., for a

6

consultative pediatric examination on July 26, 2005. (R. 169-172). Dr. Lathan's impression of B.P. was that she was a nine year old girl with a history of bipolar disorder and asthma. B.P. told Dr. Lathan that her typical activities were playing with friends, taking gym classes and watching television and she looked well. Lathan concluded that B.P. could participate fully in all age appropriate educational, social and recreational activities with sporatic periods of diminished functional capacity due to asthma. He also recommended a psychiatric consultation.

On July 26, 2005, Kim Arrington, Psy.D., who practices with Dr. Lathan examined B.P. for psychiatric ailments. In her intake report, Dr. Arrington found that B.P. has difficulty sleeping, loses her temper easily, deliberately annoys others and often cannot concentrate adequately. In addition, B.P. was inattentive, careless and disorganized. She cannot stay in her seat at school, and talks incessantly during class. She frequently bathes and grooms herself. At school, she plays alone, and has trouble making friends and is often teased by her classmates. She enjoys swimming, playing basketball and singing. Dr. Arrington concluded that B.P. answered evaluation questions responsively, and that her social skills and overall presentation were age appropriate. Moreover, her thought processes, speech, attention, remote memory, insight and judgment were normal. Cognitive functioning was below average. With regard to her daily functioning, Dr. Arrington opined, as long as she is stable on her psychotropic medication she will be able to "function appropriately for her age. (R. 175)

On September 20, 2005, B.P. returned to Trinitas Hospital. At that time, B.P. was taking Risperdal regularly. Her symptoms were panic attacks, allergic reactions and asthma attacks. She was not experiencing any suicidal, homicidal or other psychotic symptoms. She was anxious and panicky about once a week; and her insight, judgment and impulse control were limited when she

7

was upset. (R. 194-195).   The psychiatrist recommended that she continue therapy and her medication.

On or about the same day as the visit to Trinitas Hospital, her fourth grade teacher answered a questionnaire regarding B.P.'s school work. In this report, her teacher commented as to B.P.'s ability to acquire and use information:

> B.P. struggles daily to stay on task and complete work at a 4th grade level." She receives continuous small group instruction but needs to be monitored for comprehension at all times. Her reading comprehension and recall skills are very low and she lacks a strong foundation in most math concepts.  (R. 178).

> \* \* \*

> B.P. has a hard time organizing her school work. She constantly forgets her task  and will ask for help at that time. She is given more time to finish her assignments on a daily basis, but still makes many mistakes. (R. 179).

In addition, the teacher commented on the domain of "attending to and completing tasks". The teacher noted "obvious" problems with focus, refocusing, single step instructions, waiting to take turns; and very serious problems with multi-step instructions, organization, completing assignments and careless mistakes. There were no problems observed in the areas of interacting and relating with others.

In January 2006, B.P. moved in with her aunt. This stress caused increased anxiety and paranoia. The physician increased B.P.'s Risperdal dosage to counteract her increased paranoia and to prevent hallucinations. At the time, children in the neighborhood were taunting her to fight, and she was afraid to go to school. In fact, she did not attend school for about one month.  She was restless and anxious. (R. 262).   Her insight, judgment and impulse control were limited. (R. 263).

8

In March 2007, B.P.'s therapist at Trinitas Hospital recommended home tutoring while B.P. underwent psychotherapy due to anxiety of the new school situation. By late March, B.P. improved. She resumed attending school with passing grades, and she denied hallucinations. Her medications were satisfactory. (R. 268).

In June 2006, B.P. was gaining weight rapidly (165 lbs) and having problems sleeping; but otherwise she was less anxious and had adjusted to Risperdal tablets. (R. 269). In July 2006, B.P.'s psychiatrist noted that B.P. had a horrible academic year. She was attending summer school because she had failed most of her subjects due to excessive absences. However, no suicidal, homicidal or psychotic symptoms were noted. (R. 272).

During the 2006-07 academic year (fifth grade), B.P. attended school more regularly, but her grades were dismal. On February 2, 2007, the principal sent at least five form letters to B.P.'s mother with tests on different subjects attached. The form letter reads:

> Dear Parent,
>
> As the principal of Ben Franklin School No. 13 and as a taxpayer in the great state of New Jersey, I am very disappointed in the attached work of your child. You probably know that I spend hours of my professional and personal time reviewing the work of the students to ensure that the teachers are teaching and that the students are learning. While test review is part of my responsibility . . . I see great potential in each of your child [sic] and take extra steps to ensure that your child receives a well rounded education here at Ben Franklin.
>
> New Elizabeth Board Policies on Promotion and Retention
>
> •     Attendance - children must be in school 95% or 171 school days.

9

The district is sending out letters to children who are absent!

- Proficient on NJ ASK tests and between 41-75% on the

TERRA NOVA.

- Passing Report Card grades - S, G, VG, E . . . . no NI or U accepted.

- Proficient on District Assessments and Benchmarks

The final decision to retain or pass a student will remain  with the school authorities.

NO MORE SOCIAL PROMOTIONS!

We must safeguard our children and their education.  Remember the Elizabeth School District policies will no longer tolerate "Social Promotions" (R. 309) (ellipses in original).

This letter was signed by the principal.  Annexed to the above letter were some of B.P.'s recent

test scores, including but not limited to:

| | |
|---|---|
| Fractions (37%) | (R. 293) |
| Grammar Assessment (30 %) | (R. 297) |
| Health (53%) | (R. 302) |
| History (25%) | (R. 306) |
| Scientific Notation (38%) | (R. 307) |

In another report for that year entitled "Academic Grading Key", B.P. received a grade of

"needed improvement" (NI) in every major area of study, including reading, language arts, spelling,

mathematics, social studies and health (R. 329). According to the form, a grade "needs

improvement" is assessed where the grade is below 70%.  On the other hand, her attendance had

significantly improved.

10

On April 7, 2007, a teacher, Pamela Davis-Sanders, wrote a report about B.P. in conjunction with this litigation. She believed that B.P. is "very capable . . . and has great possibilities of achieving success with proper nurturing, study habits and support outside of what we can provide here." However, Ms. Davis-Sanders acknowledged that B.P. has difficulty interacting with other children, controlling her temper and is easily provoked. This often creates a "hostile environment" in the classroom.

At the administrative hearing on March 30, 2007, both B.P. and her mother (Ms. Cooper) testified. At the time of the hearing, B.P. was eleven years old. B.P. attended psychotherapy sessions at Trinitas monthly, but it was recommended that she attend sessions once a week. Ms. Cooper acknowledged that B.P. hallucinations are "not as severe [as] before she got the medication." (R. 337). According to Ms. Cooper, B.P. still suffers from insomnia, sometimes walks around all night, and takes benadryl to induce sleep. B.P.'s weight fluctuates, and she has gained about 100 pounds over the last 3-4 years. (R. 341). B.P. requires constant supervision. In a moment, she can go from euphoria to depression, and from very docile to a state of manic kinetic energy. These symptoms are not controlled by medication. (R. 343).

With regard to B.P.'s insomnia, Ms. Cooper testified that she is wired up all the time, and that often they share a bed in order to calm her down. With regard to B.P.'s mood changes, the mother characterized B.P. as "surly" and "irritable". (R. 347). She has crying spells, and her mind races from thought to thought. B.P. has low self esteem. She thinks she is fat and doesn't like her herself. According to Ms. Cooper, B.P. has difficulty getting along in school. For instance, Ms. Cooper related a recent incident where B.P. was in the hallway calling people names. When approached by a teacher, she became very defiant and started to yell and scream. At other times

11

when she is at the park, she will threaten other people for no apparent reason.  Her mother says that she is unable to handle B.P. because of her own recent illness (she suffered a stroke in 2004) and lack of sleep due to B.P.'s insomnia.  Cooper testified that B.P. misses school when she is sick or has an incident.  B.P.'s social skills are not good, and other kids don't like to hang out with her and tease her. Her friendships are restricted to her family.

B.P. realistically assessed her state of being. (R. 357).  When questioned about her daily life, she quickly responded, "well, I love my mom for one," and "I love sports".  She enjoys playing ball with her baby brother, but her only friend is her mom, and she is teased at school by the other children.  She doesn't like other kids because they pick on her.  (R. 357).  At school, B.P. sometimes plays with a girl named Abria, unless Abria is playing with other kids, and then she plays by herself.  She likes gym and Spanish classes but hates math.  She acknowledged that teachers sometimes yell at her and make her sit in the corner because she gets "a little" angry and has "a little" success in controlling it.  When asked  whether her medications improved her life, she responded that when she was young, she was acting a "little out of the walls," and her mother couldn't control her.  Her mother didn't know what was wrong with her until "one day I told her what was really happening to me, and all the bad dreams I was having that seemed so real. I used to wake up in the middle of the night breaking out in sweats from the bad dreams that I used to have."  B.P. stated that the bad dreams have subsided, and the hallucinations had stopped since she went to the hospital. (R. 363).  At the present time, according to B.P., her therapist thinks she is doing good, but she needs to lose weight.

II.

The SSI program is a federal program that provides benefits to needy, aged, blind or disabled individuals who meet certain statutory income and resources limitations. *See* 42 U.S.C. §§ 1381 and 1382. For purposes of eligibility for SSI, a child under the age of eighteen is considered disabled if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner has set forth a three-step process for evaluating disability in children, set forth at 20 C.F.R. § 416.924, under which a child must show (i) that she is not engaged in substantial gainful activity; (ii) that she has a "severe" impairment or combination of impairments; and (iii) that her impairment or combination of impairments meets, medically equals or functionally equals the severity of an impairment listed at 20 C.F.R. Part 404 Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924.

The regulations set forth the method to decide whether an impairment is functionally equivalent in severity to a listing for childhood disability cases under the programs. These regulations provide that a child's functioning is assessed within a framework of six broad areas of functioning called domains. There are six such domains: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well being. 20 C.F.R. § 416.926a(b)(1)(I)-(vi). For a child to functionally equal a listed impairment, he or she must have marked limitations in two domains or an extreme limitation in one. A marked limitation in a domain is found when an impairment interferes seriously with a child's ability to independently

13

initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2). A marked limitation is more than moderate but less than extreme. *Id.* An extreme limitation in a domain is found when the impairment interferes "very seriously" with a person's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3). An extreme limitation is more than marked and is a description given to the worst limitations. *Id.* The regulations also set forth other factors taken into consideration when evaluating the effects of an impairment on a child's functioning. These factors include how functioning compares to the functioning of children of the same age who do not have impairments and how well the child initiates, sustains and completes his/her activities, including the amount of help or adaptation needed. 20 C.F.R. §416.924(a).

### III.

Review of ALJ by District Court

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see also* 42 U.S.C. §405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. S 405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. " *Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to

14

support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9.

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence -- particularly certain types of evidence (e.g., that offered by treating physicians) -- or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sec'y of Health and Human Servs.*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder"). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

In deciding B.P.'s SSI claim, the ALJ applied the three-step sequential evaluation analysis set forth at 20 C.F.R. § 416.924(a)-(d). At step one, the ALJ found that B.P. had never engaged in substantial gainful activity. (R. 14). At step two, the ALJ found that B.P.'s asthma and affective disorder were severe impairments within the meaning of the Act. (R. 14). At step three, the ALJ found that these impairments did not meet or medically equal a listing under Appendix 1, Subpart P, Regulations No. 4. (20 C.F.R. §416.924(d), sections 103.00 or 112.00, including 112.04. (R. 14-15). Next, the ALJ evaluated B.P.'s impairments to determine whether they were "functionally equivalent" to a listed impairment, and he determined that they were not. (R. 16-18). More specifically, the ALJ made the following findings:

1. The claimant has not performed any substantial gainful activity since August 6, 2004, the protective filing date of the supplemental security income (child) application. (20 C.F.R. §416.924(b).

2. The claimant has the following severe impairments: asthma and affective disorder.

3. The claimant does not have an impairment, or combination of impairments, which meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4. (20 C.F.R. §416.924(d)).

4. The claimant has not been under a "disability" as defined in the Social Security Act at any time through the date of this decision. (20 C.F.R. §416.906, 20 C.F.R. §416.924(d).

He concluded as follows:

> I conclude, on balance, that the combined objective record supports
> a conclusion that [B.P.] has improved with medications. I further
> conclude that although it has arguably been shown that the claimant
> has marked impairment in one functional domain, i.e. attending to
> and completing tasks, there has been no more than less than marked

16

impairment demonstrated in two other domains, i.e. acquiring and using information and interacting and relating with others; and no impairment reference in other domains. (R. 18).

For the reasons set forth below, the Court finds that the ALJ's conclusions are against the great weight of the evidence.

First, there is an obvious void in the record. The ALJ did not consider the side effects of the medicines Risperdal[3], benedryl and the albuterol inhaler. As a matter of policy, the Social Security Administration considers many things when determining disability for children. 20 C.F.R. §416.924(a). One of the considerations set forth in the Regulations is the side effects of medications. The Regulations counsel that although "medications may control the most obvious manifestations of your impairment, they may or may not affect the functional limitations." More specifically, the Regulations state in pertinent part:

> (9)     The effects of treatment (including medications and other treatment). We will evaluate the effects of your treatment to determine its effect on your functioning in your particular case.
>
> (i)     Effects of medications. We will consider the effects of medication on your symptoms, signs, laboratory findings, and functioning. Although medications may control the most obvious manifestations of your impairment(s), they may or may not affect the functional limitations imposed by your impairment(s). If your symptoms or signs are reduced by medications, we will consider:
>
> (A)     Any of your functional limitations that may nevertheless persist, even if there is improvement from the medications;
>
> (B)     Whether your medications create any side effects that cause or contribute to your functional limitations;

---

[3]     www.pdrhealth.com states that "the safety and effectiveness of Risperdal have not been studied in children, " but the side effects found in adults include insomnia, agitation, anxiety, restlessness and weight gain.

17

(D)     Changes in your medication or the way your medication is
prescribed; and

(E)     Any evidence over time of how medication helps or does not
help you to function compared to other children your age who
do not have impairments.     20 C.F.R. §416.924(a)(9)(i).

Similarly, the Supreme Court identified the side effects of medication as a factor to be

considered in determining whether a child is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 535 (1990).

Justice Blackmun reasoned:

> For children, however, there is no similar opportunity. Children
> whose impairments are not quite severe enough to rise to the
> presumptively disabling level set by the listings; children with
> impairments that might not disable any and all children, but which
> actually disable them, due to symptomatic effects such as pain,
> nausea, side effects of medication, etc., or due to their particular age,
> educational background, and circumstances . . . are denied benefits,
> even if their impairments are of "comparable severity" to ones that
> would actually (though not presumptively) render an adult disabled.

*Id.* In this case, Risperdal, benedryl and the albuterol inhaler are powerful drugs, and their effect on

B.P. was not evaluated.  In order to fairly judge this case, the side effects must be considered in the

Administration's decision.  Hence the decision of the ALJ violates the Administration's written

policy.  At the very least, this requires remand, but the following reasons require reversal.

Second, the ALJ infers that B.P.'s school work improved as the hallucinations subsided, or

that her poor grades are a result of lack of motivation. The ALJ found that B.P. has "more of a

motivational problem rather than an across the board inability to learn."  Although there was a

reference or two to motiviational issues, the record as a whole does not square with that finding.  It

is difficult to understand how B.P. can be found to lack motivation when (a) she cannot sit in her seat

at school for a reasonable period of time; (b) she has a marked limitation in attending and completing

18

tasks (homework will never be accomplished); and (c) she has insomnia (any parent can attest that a child who does not have adequate sleep does not function properly). These reasons outweigh any motivational issue. The ALJ bolsters his lack of motivation conclusion on B.P.'s "choosing those subjects in which she wishes to achieve and discarding those that she does not care for." (R. 17). Such a conclusion is strained. For the 2006-07 school year, B.P. received a grade of "needed improvement" in all major content areas including math, grammar and history with the exception of science. (R. 293-307). Although she earned good grades in art and gym, they cannot be equated to content area subjects. Hence, this finding of fact is not supported by the evidence.

Third, the ALJ gives considerable weight to the opinion of B.P.'s teacher Ms. Davis-Sanders. This Court agrees hers is an important letter which deserves great weight; however, the ALJ misconstrues it. The ALJ relied on the teacher's letter to show that B.P. has the potential to become a "a very capable student with great opportunities for success." However, the ALJ ignores the facts that Ms. Davis-Sanders enumerates before this favorable comment. Ms. Davis-Sanders conditions her conclusion on "proper nurturing, study habits and support outside of what we can provide here." Obviously, the "outside" support is a broad term, inferring substantial independent intervention. In addition, the ALJ glosses over other alarming facts set forth within the letter, including: (1) B.P. has difficulty interacting on a positive level with peers; (b) she creates a hostile environment; (c) she is easily provoked; (d) she can not control herself; and finally (e) she wishes to be liked by the other children but does not always choose the right approach. Hence, the letter of Ms. Davis-Sanders read as a whole does not support the ALJ's conclusion that B.P. has turned the corner and is functioning adequately. To the contrary, it shows B.P. is a very challenged child.

19

Lastly, the evidence does not support the ALJ's finding that there is less than marked impairment in the domain of "interacting and relating to others." Granted, B.P. does fair with adults, but the evidence as a whole underscores a very serious issue. The evidence is:

(1)     B.P. is teased by classmates;

(2)     her own mother characterized her as "surly;"

(3)     according to Ms. Davis-Sanders, B.P. often creates a "hostile environment" in class;

(4)     B.P. testified that she has no friends other than her mother;

(5)     she threatened others at the park;

(6)     there are incidents where she screamed at other children; and

(7)     her teachers scold her and sometimes place her in the corner away from others.

Such activity evidences a child who is not interacting and relating to her peers.

In order to qualify for benefits, B.P. must have "marked limitation in two domains." 20 C.F.R. § 416.926a(e)(2). The ALJ correctly found that B.P. has a marked limitation in the domains of attending and completing tasks. Additionally, the record supports a conclusion that B.P. also has a marked limitation, if not extreme, in the domain of "interacting with and relating to others". Whether her inability to interact with others is due to her psychiatric disorder, a side effect of the medicine, her insomnia or a combination of the above is not a determinative factor. The focus of the Regulations are on the ability to function. The record as a whole supports a marked limitation in B.P.'s ability to interact and relate to others. For B.P., an eleven-year old, to have no friends, to threaten others, to scream at teachers, and to cause a hostile environment at school is evidence of marked limitation in this domain.

20

Since the Court finds substantial evidence of two domains in which B.P. has marked

limitation, she is entitled to SSI benefits.  The decision of the Commissioner of the Social Security

Administration is hereby reversed.


s/Peter G. Sheridan
PETER G. SHERIDAN, U.S.D.J.


October 20, 2008